UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTHONY MARCUS #07-A-7130,

            Plaintiff,

-against-

ANTHONY J. ANNUCCI-ACTING
COMMISSIONER OF DOCCS, et al.,

            Defendants.

**OPINION AND ORDER**

20-CV-06234 (PMH)

PHILIP M. HALPERN, United States District Judge:

      Anthony Marcus ("Plaintiff"), proceeding *pro se* and *in forma pauperis*, initiated this action under 42 U.S.C. § 1983 by way of a Complaint filed on August 7, 2020. (Doc. 2, "Compl.").[1] Plaintiff alleged that while incarcerated at Green Haven Correctional Facility in Stormville, New York ("Green Haven"), five employees of the New York State Department of Corrections and Community Supervision ("DOCCS")—specifically, Acting DOCCS Commissioner Anthony J. Annucci ("Annucci"), DOCCS Director of Special Housing Donald Venettozzi ("Venettozzi"), Former Green Haven Superintendent Jamie LaManna ("LaManna"), Hearing Officer Eric Gutwein ("Gutwein"), and Correction Officer L. Malave ("Malave," and collectively, "Defendants")—violated his constitutional rights in connection with disciplinary charges levied against him in October 2018. (*See generally id*.).

---

[1] Citations to the Complaint correspond to the pagination generated by ECF.

On January 31, 2022, the Court granted in part Defendant's motion to dismiss. (Doc. 44).[2] All claims were dismissed except for the Fourteenth Amendment procedural due process claim against Gutwein, which proceeded to discovery. (*Id.*).

On January 13, 2023, in accordance with the briefing schedule set by the Court, Gutwein served his motion for summary judgment on Plaintiff. (Doc. 61; Doc. 62, "Def. Br."; Doc. 63, "Martin Decl."; Doc. 64; Doc. 65, "56.1 Stmt."; Doc. 67). After receiving an extension of time from the Court, Plaintiff filed his opposition to Gutwein's motion for summary judgment on March 1, 2023. (Doc. 59; Doc. 60, "Opp."). Gutwein's motion was fully submitted upon the filing of his motion papers and reply brief on April 12, 2023. (Doc. 66, "Reply"; Doc. 68).

For the reasons set forth below, Gutwein's motion is GRANTED.

## BACKGROUND

The Court recites the facts herein only to the extent necessary to adjudicate the extant motion and draws them from: (1) the Complaint; (2) Gutwein's Rule 56.1 Statement[3]; (3)

---

[2] The Court's Order granting in part Defendants' motion to dismiss is available on commercial databases. *See Marcus v. Annucci*, No. 20-CV-06234, 2022 WL 280935, at *6-8 (S.D.N.Y. Jan. 31, 2022). For ease of reference, the Court cites herein the copy of the Order filed on the docket.

[3] Plaintiff did not submit a Rule 56.1 statement. While "*pro se* litigants are [ ] not excused from meeting the requirements of Local Rule 56.1 . . . where a *pro se* plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009); *see also Gadson v. Goord*, No. 96-CV-07544, 2000 WL 328879, at *3 (S.D.N.Y. Mar. 28, 2000) ("Plaintiff did not submit a Statement Pursuant to Civil Rule 56.1. Instead, he submitted 'Plaintiff's Opposition for Defendant's Memorandum of Law in Support of Motion for Summary Judgment,' stating his disagreement with the defendant's version of the facts. In light of plaintiff's *pro se* status, the Court will accept this memorandum in lieu of a Rule 56.1 Statement."). The Court considers Plaintiff's Declaration in Opposition to Defendant's Motion for Summary Judgment and his disagreement with statements in Gutwein's Rule 56.1 Statement to the extent that the disagreement is supported by evidence in the record. The Court is mindful that bald and conclusory statements contained in Plaintiff's Declaration do not constitute opposition to Gutwein's Rule 56.1 Statement. *See Woods v. Acampora*, No. 08-CV-04854, 2009 WL 1835881, at *3 (S.D.N.Y. June 24, 2009) ("[A] *pro se* party's 'bald assertion' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." (quoting *Odom v. Keane*, 1997 WL 576088, at *3 (S.D.N.Y. Sept. 17, 1997)).

Plaintiff's opposition; and (4) the Martin Declaration, together with the exhibits annexed thereto, which includes a transcript of Plaintiff's deposition, conducted on July 7, 2022 (Doc. 63-1, "Plf. Tr.").

On October 12, 2018, Angelique Marcus, Plaintiff's niece, and Michelle Marcus, Plaintiff's sister, came to Green Haven to visit Plaintiff. (56.1 Stmt. ¶ 7; Opp. at 88; Doc. 63-4; Doc. 63-5). Upon being interviewed by investigators from the DOCCS Office of Special Investigation ("OSI"), Angelique Marcus produced one blue balloon containing a tan powder substance from her vaginal area and surrendered it to investigators. (56.1 Stmt. ¶ 8; Doc. 63-5; Doc. 63-6). The substance in the balloon tested positive for 7.5 grams of heroin. (56.1 Stmt. ¶ 9; Doc. 63-5; Doc. 63-6; Doc. 63-7). Angelique Marcus was arrested for Promoting Prison Contraband and Criminal Possession of a Controlled Substance. (56.1 Stmt. ¶ 10; Doc. 63-6).

Plaintiff, on October 13, 2018, was placed in keeplock and charged with conspiring to bring narcotics into Green Haven. (56.1 Stmt. ¶ 3). The Misbehavior Report, dated October 12, 2018, indicated that Plaintiff was the subject of an ongoing investigation by OSI and charged Plaintiff with four violations: (1) Drug Possession; (2) Smuggling; (3) Facility Visitation Violation; and (4) Phone Program Violation. (56.1 Stmt. ¶¶ 3-4). The narrative charged that Plaintiff:

> solicited from and conspired with others to smuggle contraband into him at Green Haven CF. On the above date and approximate time visitor Angelique Marcus was interviewed by Investigators from NYSDOCCS OSI Narcotics Unit. During the interview, she voluntarily surrendered a (1) blue balloon. Said balloon contained one clear plastic baggie containing a tan powdery substance. The tan powdery substance was field tested using NIK Test Kit L, by Certified NIK tester C. Meigs. The field test[] yielded a positive test . . . [for] heroin. Said heroin had an aggregate weight of 7.5 grams.
>
> As part of an ongoing investigation, inmate Marcus did activate his inmate Pin and place a phone call to his visitor Angelique Marcus on 09/30/18 at 20:12. During this phone call inmate Marcus can be heard directing his visitor to "put it up and everything[.]" Visitor

3

> Marcus responded, ["]its little, like a quarter size." Inmate then asked, "what is it". Visitor Marcus stated, "its sugar . . . baby powder." Based on my training and experience this phone call contains coded conversation regarding secreting contraband inside of his visitor's body and code words used for contraband drugs. The aforementioned is a result of an investigation conducted by the NYSDOCCS Office of Special Investigations, Narcotics Unit. END OF REPORT.[4]

(Doc. 63-3).

The hearing, presided over by Gutwein, was convened on October 16, 2018 wherein Plaintiff pled not guilty to the charges contained the Misbehavior Report. (56.1 Stmt. ¶¶ 11-13; Doc. 63-8; Doc. 63-9). Plaintiff was assigned an assistant for his disciplinary hearing and met with the assistant "about four times." (56.1 Stmt. ¶ 14; Plf. Tr. at 19:2-13). Plaintiff asked the assistant to procure Angelique Marcus, Meigs, Malave and inmate Elliot Hankerson ("Hankerson") as witnesses for the hearing. (Plf. Tr. at 19:22-20:18; 22:18-24:7). Each of these individuals testified except for Angelique Marcus. (*Id*.). Plaintiff also asked the assistant for a number of documents that Plaintiff contends would have supported his plea of not guilty. Plaintiff alleges that Gutwein—after the assistant failed to secure them—failed to provide Plaintiff the following documents: (1) the visitor log from October 12, 2018; (2) Plaintiff's phone log from September 30, 2018; (3) the toxicology test; (4) photographs of the balloon and substance excised therefrom; (5) the October 12, 2018 registration forms that each visitor must sign and bring with them onto the visiting room floor; and (7) the record showing the time, location, and date of all phone calls made with Plaintiff's PIN. (Compl. at 4-5, 13-14; Opp. ¶ 8; Plf. Tr. at 25:10-36:4; 27:3-28:17; 31:9-21; 32:15-24; 34:16-35:9; 38:8-39:18).

---

[4] The narrative contained in the Misbehavior Report is a single, continuous block without indentation of any kind. The Court, for clarity purposes only, has broken the block into two sections.

4

At the disciplinary hearing, Plaintiff was permitted to ask questions of the witnesses and to tell Gutwein his side of the story. (56.1 Stmt. ¶¶ 21-22; Plf. Tr. at 20:19-22; 49:16-19; 54:21-23). Plaintiff was also able to listen to the audio recordings of his conversations with Angelique Marcus on September 30, 2018. (56.1 Stmt. ¶ 16; Plf. Tr. at 30:19-31:8). Gutwein found Plaintiff guilty of all charges in the Misbehavior Report on November 26, 2018 and imposed the following penalties: (1) forty-five days' keeplock confinement; (2) ninety days' loss of recreation, packages, commissary, and phone; (3) one hundred eighty days' loss of visitation privileges; and (4) a recommendation that Plaintiff be docked two months' good time credit. (56.1 Stmt. ¶¶ 23-24; Doc. 63-8).

Plaintiff, in turn, filed an action under Article 78 of the N.Y. C.P.L.R. in the New York State Supreme Court, Albany County. (*See* Compl. at 7-10, 49-83). During the pendency of that proceeding, DOCCS' counsel wrote a letter to the Supreme Court: (1) explaining that the adjudication was reversed and expunged from Plaintiff's disciplinary history; and (2) requesting that the "proceeding be dismissed as moot, inasmuch as the agency has granted petitioner all the relief to which he is entitled." (*Id*. at 91). The reason for reversing and expunging the adjudication was that DOCCS "fail[ed] to maintain a complete electronic record of the hearing." (*Id*. at 89). The Supreme Court agreed with counsel's request and, on November 8, 2019, issued a Decision and Order concluding, in pertinent part, that:

> [b]ased upon the record, the petition is moot and respondents' request for dismissal should be granted as the determination finding petitioner guilty was administratively reversed and expunged from petitioner's disciplinary records.

(*Id*. at 117).

This litigation followed.

5

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).[5] "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-05486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence; the task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial. . . ." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)). Claims simply cannot proceed in the absence of sufficient proof as to an essential element.

"It is the movant's burden to show that no genuine factual dispute exists," *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)), and a court must "resolve all ambiguities and draw all

---

[5] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

reasonable inferences in the non-movant's favor." *Id*. (citing *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 442 F. Supp. 3d at 722 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts. . . ." *Id*. (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, "[i]f there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must establish also its "entitlement to judgment as a matter of law." *In re Davis New York Venture Fund Fee Litig.*, 805 F. App'x 79, 80 (2d Cir. 2020) (quoting *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019)). Stated simply, the movant must establish that the law favors the judgment sought. *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 834 (E.D.N.Y. 1995) (explaining "that summary judgment is appropriate only when . . . law supports the moving party"); *Linares v. City of White Plains*, 773 F. Supp. 559, 560 (S.D.N.Y. 1991) (explaining that summary judgment is appropriate when "the law so favors the moving party that entry of judgment in favor of the movant dismissing the complaint is proper").

The Court is, of course, mindful that "[*p*]*ro se* litigants are afforded a special solicitude," which includes reading their filings "to raise the strongest arguments they suggest." *Mortimer v. City of New York*, No. 15-CV-07186, 2018 WL 1605982, at *9 (S.D.N.Y. Mar. 29, 2018). "It is through this lens of leniency towards *pro se* litigants that this Court must consider a defendant's

7

motion for summary judgment against a *pro se* plaintiff." *Adams v. George*, No. 18-CV-02630, 2020 WL 5504472, at *5 (S.D.N.Y. Sept. 8, 2020). This status does not, however, excuse a *pro se* litigant from making the showing required to defeat summary judgment; he or she must offer more than "bald assertions, completely unsupported by evidence" to overcome the motion. *Wisdom v. Loiodice*, No. 17-CV-04837, 2020 WL 4431590, at *4 (S.D.N.Y. July 31, 2020); *see also Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (explaining that the mere fact that a litigant is *pro se* "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment"); *Ross v. Koenigsmann*, No. 14-CV-01321, 2017 WL 9511096, at *1 (N.D.N.Y. Aug. 16, 2017), *adopted sub nom. Ross v. Mannava*, 2017 WL 4338883 (N.D.N.Y. Sept. 29, 2017).

## ANALYSIS

Plaintiff's claim for relief proceeds under 42 U.S.C. § 1983. That law provides, in pertinent part, that "[e]very person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983. "[T]his language . . . creates a mechanism by which individuals can vindicate the violation of rights secured elsewhere." *Linares v. Annucci*, No. 19-CV-11120, 2021 WL 2689736, at *6 (S.D.N.Y. June 30, 2021) (quoting *Santucci v. Levine*, No. 17-CV-10204, 2021 WL 76337, at *3 (S.D.N.Y. Jan. 8, 2021) (first alteration in original)). Plaintiff's claim against Gutwein for violation of procedural due process stems from the Fourteenth Amendment. (*See generally* Compl.).

The Fourteenth Amendment provides, in pertinent part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV § 1. "In order for Plaintiff to state plausibly a claim for violation of his Fourteenth Amendment

8

procedural due process rights, he must: (1) identify a protected liberty interest; and (2) identify the procedure that deprived him of that liberty interest." *Linares*, 2021 WL 2689736, at *7 (citing *Joseph v. Cuomo*, No. 20-CV-03957, 2021 WL 200984, at *6 (E.D.N.Y. Jan. 20, 2021)). Gutwein argues that Plaintiff has failed to establish that he deprived Plaintiff of sufficient process because Plaintiff had no protected liberty interest and, even if he did, any due process violations were harmless error. (*See generally* Def. Br.).

I. Prong One: Protected Liberty Interest

"An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes 'an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Whitaker v. Super*, No. 08-CV-00449, 2009 WL 5033939, at *5 (N.D.N.Y. Dec. 14, 2009) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). As determined in the Court's prior Order granting in part Defendants' motion to dismiss, the only alleged deprivation which may implicate a protected liberty interest is Plaintiff's 180-day restriction on visitation which encompassed both contact and non-contact visitation. (Doc. 44 at 13-14). Denial of visitation may constitute a constitutional violation depending on the factual circumstances. *See i.e.*, *Hill v. Laird*, No. 06-CV-00126, 2016 WL 3248332, at *10 (E.D.N.Y. June 13, 2016) ("The Court's determination as to whether the denial of visitation . . . implicate[s] a liberty interest under *Sandin* is fact-specific.").

Here, the record contains no evidence that the restriction on Plaintiff's visitation for 180-days constituted an "atypical and significant hardship." *See Sandin*, 515 U.S. at 484. (*See generally* Opp.). The Court construes Plaintiff's opposition as arguing atypicality based on the length of time his visitation privileges were suspended. (Opp. at 7). However, courts have found visitation

suspensions of intermediate length insufficient to establish a liberty interest without additional facts showing an "atypical and significant hardship." *See i.e., Hill,* 2016 WL 3248332 at *10 ("[T]he record appears to indicate that all of Plaintiff's visits (namely, both contact and non-contact visitation) were revoked in connection with the Disciplinary Hearing . . . Nevertheless, the Court finds that Plaintiff has not asserted any facts that would render his 150-day visitation suspension an 'atypical and significant hardship.'"). Moreover, withdrawal of visitation privileges was particularly warranted here given that Plaintiff was found guilty of violating visitation rules. *See Overton v. Bazzetta*, 539 U.S. 126, 137 (2003) ("withdrawal of visitation privileges for a limited period as a means of effecting prison discipline . . . is not a dramatic departure from accepted standards for conditions of confinement."). Accordingly, the Court concludes that the restriction imposed on Plaintiff's visitation privileges does not raise a liberty interest sufficient to trigger Plaintiff's constitutional due process rights.

Plaintiff additionally argues in opposition that his potential loss of good time credits—as opposed to loss of good time credit already earned—constitutes a protected liberty interest. (Opp. at 7). It does not. *See Abed v. Armstrong*, 209 F. 3d 63, 66-67 (2d Cir. 2000) ("Although inmates have a liberty interest in good time credit they have already earned, no such interest has been recognized in the opportunity to earn good time credit where . . . prison officials have discretion to determine whether an inmate or class of inmates is eligible to earn good time credit"). Plaintiff's discipline was reversed and expunged on appeal, the loss of good time credit already earned was reversed, and there is no evidence in the record suggesting that Plaintiff will ever lose the good time credit earned, based on the disciplinary hearing. Accordingly, Plaintiff has not established a protected liberty interest concerning good time credit earned.

II.     Prong Two: Insufficient Process

Even if the Court were to assume that Plaintiff had a protected liberty interest, Gutwein argues that Plaintiff has failed as a matter of law to establish that he was denied sufficient process during his disciplinary hearing. (Def. Br. at 11-13). The Court agrees.

"The due process protections afforded a prison inmate do not equate to 'the full panoply of rights' due to a defendant in a criminal prosecution." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 555–56 (1974)). As regards procedural due process afforded to a prisoner with respect to disciplinary hearings, the Second Circuit instructs that:

> [i]n a prison disciplinary hearing, due process rights provide that at a minimum, a prisoner is entitled to be confronted with the accusation, informed of the evidence against him and afforded a reasonable opportunity to explain his actions. More specifically, an inmate must receive advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions.

*Williams v. Korines*, 966 F.3d 133, 143 (2d Cir. 2020). "However, none of these due process rights is absolute, and accordingly are individually and collectively subject to harmless error analysis." *Brown v. Venettozzi*, No. 18-CV-02628, 2022 WL 3867958, at *7 (S.D.N.Y. Aug. 30, 2022) (citing *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991)). Here, the second requirement—that is, affording Plaintiff a reasonable opportunity to call witnesses and present documentary evidence—is at issue. *See Jackson v. Prack*, No. 16-CV-07561, 2019 WL 6119010, at *7 (S.D.N.Y. Nov. 18, 2019)("[A]ny violations of an inmate's qualified right to call witnesses or present documents are reviewed for harmless error, . . . so an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing.").

The Court notes that "prison officials must have the necessary discretion to keep the hearing within reasonable limits and . . . limit access to . . . documentary evidence," *Wolff*, 418 U.S. at 566, and that evidence "can be denied on the basis of irrelevance or lack of necessity." *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991). However, where, as here, an inmate was placed in segregated housing, the Second Circuit instructs that "due process requires that he receive 'substantive assistance in preparing a defense.'" *Girard v. Chuttey*, 826 F. App'x 41, 45 (2d Cir. 2020) (quoting *Ayers v. Ryan*, 152 F.3d 77, 80-81 (2d Cir. 1998)). This assistance, "an obligation imposed by the Due Process Clause of the Fourteenth Amendment," *Amaker v. Goord*, No. 09-CV-00396, 2019 WL 1033511, at *2 (W.D.N.Y. Mar. 5, 2019), involves "gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses." *Elder v. McCarthy*, 967 F.3d 113, 126 (2d Cir. 2020) (quoting *Eng v. Coughlin*, 858 F.2d 889, 898 (2d Cir. 1988)). "At a minimum, the assistant should perform the investigatory tasks which the inmate, were he able, could perform himself," *Amaker*, 2019 WL 1033511, at *2, and do so "in good faith and in the best interests of the inmate." *Mayo v. Lavis*, No. 11-CV-00869, 2016 WL 2756545, at *7 (W.D.N.Y. May 12, 2016) (quoting *Eng*, 858 F.2d at 898), *aff'd*, 689 F. App'x 23 (2d Cir. 2017). However, the inmate's right to assistance is "limited", and "any violations of this qualified right are reviewed for 'harmless error.'" *Brown*, 2022 WL 3867958 at *7.

  a. <u>Alleged Denial of Requested Documents</u>

Plaintiff's procedural due process claim is based on Gutwein's failure to secure the following materials prior to the disciplinary hearing: (1) the visitor log from October 12, 2018; (2) Plaintiff's phone log from September 30, 2018; (3) the toxicology test; (4) photographs of the balloon and substance excised therefrom; (5) the October 12, 2018 registration forms that each visitor must sign and bring with them onto the visiting room floor; and (7) the record showing the

time, location, and date of all phone calls made with Plaintiff's PIN. (Compl. at 4; Opp. ¶ 8). Gutwein argues that Plaintiff failed to demonstrate that he was prejudiced by any denial of these documents. (Def. Br. at 11-13). The Court agrees.

Plaintiff testified at his deposition that the visitor documents—namely, the October 12, 2018 visitor log and visitor registration forms—would have supported his plea of not guilty because "[Hankerson] got a ticket for the same day, saying [Angelique Marcus] came to visit him the same day, and that is impossible." (Plf. Tr. at 20:3-6; 35:16-19). In other words, Plaintiff "was trying to see who [Angelique Marcus] came to see" because Angelique Marcus could not have come to see them both at the same time. (*Id*. at 26:12-14; 35:16-23). Contrary to Plaintiff's testimony, Hankerson's misbehavior report, attached to Plaintiff's opposition as Exhibit B, does not indicate that Angelique Marcus came to Green Haven on October 12, 2018 to visit Hankerson. (Doc. 60 at 108). Rather, it charges Hankerson with "solicit[ing] from and conspir[ing] with others to smuggle contraband into him at Green Haven . . . ." (*Id*.). Additionally, the visitor documents and Angelique Marcus' own statement, submitted as an attachment to Plaintiff's opposition, confirms that she went to Green Haven to visit Plaintiff on October 12, 2018. (Doc. 63-4 at 2, 4; Opp. at 88). Accordingly, to the extent Plaintiff sought copies of the visitor documents to establish that "Angelique Marcus was not intending to visit him" and to "creat[e] a factual inference that there had been a mistake in her visiting room processed procedure" (Opp. ¶ 10), the record belies this argument. The visitor documents would not have changed the outcome of the hearing.

In any event, even without copies of the visitor documents, Plaintiff knew from the Unusual Incident Report that Angelique Marcus went to Green Haven to visit him. (Plf. Tr. at 44:22-45:3; Doc. 63-5 ("Both [Michelle Marcus and Angelique Marcus] entered the facility to visit inmate Marcus")). Plaintiff also testified to knowing that visitors were only permitted to see one inmate

13

per day. (*Id*. at 35:24-36:7). Therefore, Plaintiff had the necessary information and any failure to provide him with the visitor documents was harmless error. *See i.e., Brown*, 2022 WL 3867958 at *8 (finding that "any failure to provide Plaintiff with the logbook itself was harmless error" where Plaintiff "received the information [he] wanted from the logbook.").

Regarding Plaintiff's requests for copies of his phone logs, Gutwein argues that Plaintiff was not prejudiced by any denial of these documents because he was able to listen to audio recordings of the calls at the hearing and admitted to making those calls. (Def. Br. at 12; 56.1 ¶ 16; Plf. Tr. at 31:7-8). The Court agrees. Plaintiff testified that he need a copy of his phone log from September 30, 2018—specifically, the conversation piece—to support that "[he] didn't conspire" to bring drugs into the facility. (*Id*. at 29:20-30:10). But Plaintiff was able to review the September 30th calls through audio recordings at the hearing. (*Id*. at 30:21-25). Since it is undisputed that Plaintiff was a speaker on the September 30th calls and that he had the opportunity to review the content of the calls at the hearing, there is no apparent information that was available from the phone log[6] but not from the audio recordings which would have changed the outcome at the hearing. Thus, the Court finds that Plaintiff failed to demonstrate he was prejudiced by any denial of the September 30th phone log.

Plaintiff separately requested, and Gutwein denied, a copy of his entire phone log showing calls made with his PIN. (*Id*. at 38:8-39:23; 56.1 Stmt ¶ 20). Plaintiff sought those documents to establish that the Misbehavior Report was incorrect in that it "was not for just that one day, it was for like seven different days." (*Id*. at 39:24-40:24). The Misbehavior Report states in pertinent part that "[a]s part of an ongoing investigation, inmate Marcus did activate his inmate Pin and place a

---

[6] Plaintiff testified that these phone logs contained information such as what phone was used, the time of the call, what number was called, and the length of the call. (Plf. Tr. at 29:15-19).

phone call to his visitor Angelique Marcus on 09/30/18 at 20:12." (Doc. 63-3). To the extent Plaintiff sought to challenge the accuracy of this statement at the hearing, he had the opportunity to do so using the September 30th audio recordings and his questioning of Malave, the author of the Misbehavior Report. Plaintiff does not explain how his entire call log was necessary to challenge the accuracy of the call referenced in the Misbehavior Report. In any event, Plaintiff has not shown that he was prejudiced by the denial of his entire call log.

Turning to the requested photographs of the balloon and the substance within, Plaintiff testified that he "was trying to show I didn't have [Angelique Marcus] bring nothing" into the facility and that he wanted to assess the color of the substance in the balloon as compared to witness testimony. (Plf. Tr. at 33:9-17; 56.1 Stmt. ¶ 18). As a threshold matter, Plaintiff does not explain how photos of the balloon and the substance inside would have supported his argument that he was not involved in Angelique Marcus' attempts to smuggle drugs into the facility. Additionally, Plaintiff's evidentiary concerns regarding the color of the substance in the balloon are not sufficient to establish a due process violation. *See Shepherd v. Fisher*, No. 08-CV-09297, 2017 WL 666213, at *37 (S.D.N.Y. Feb. 16, 2017) ("[B]ecause prison officials need not adhere to the rules of evidence in conducting inmate disciplinary proceedings, Plaintiff's various evidentiary concerns—including . . . the unavailability of color photographs of the contraband substance and the test indicating it was methamphetamine—do not rise to the level of a constitutional violation.").

Finally, Plaintiff argues for the first time in opposition that Gutwein's denial of the "toxicology test," which concluded that the tan powder substance in the balloon was heroin, constitutes a violation of due process. (Opp. ¶ 8; Doc. 63-7). Plaintiff testified that he needed the toxicology test to "see what drugs" were recovered from Angelique Marcus. (Plf. Tr. at 32:2-14). However, other documents provided to Plaintiff informed him that the substance recovered from

15

Angelique Marcus tested positive for 7.5 grams of heroin. (Doc. 63-3; Doc. 63-5). Therefore, Plaintiff had the necessary information even if he did not have a copy of the actual toxicology test. In any event, denial of the toxicology test does not amount to a constitutional violation. *See Eleby v. Selsky*, 682 F. Supp. 2d 289, 292 (W.D.N.Y. 2010) ("[P]rison inmates have no general constitutional right to documents relating to drug testing procedures . . . .").

      b.   Alleged Denial of Angelique Marcus' Testimony

Plaintiff argues for the first time in opposition that Gutwein's denial of Angelique Marcus as a witness at the disciplinary hearing constitutes a violation of procedural due process. (Opp. ¶¶ 4-7). Gutwein contends that even if Angelique Marcus had been permitted to testify, Plaintiff has not shown that the outcome of the hearing would have been different. (Reply at 3). The Court agrees.

Plaintiff generally argues that Gutwein refused to present Angelique Marcus as a witness at the hearing because of logistical concerns regarding her incarceration. (Opp. ¶¶ 4, 7). That a witness at a disciplinary hearing "would have caused delay . . . is [a] legitimate reason to refuse to call a witness." *Jackson*, 2019 WL 6119010 at *8; *see also Wolff*, 418 U.S. at 566 (right to call witnesses limited because "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits"). However, the Court need not consider whether Gutwein's denial was reasonable given that Plaintiff has not shown that he was prejudiced.

Plaintiff contends that Angelique Marcus would have testified that she was not attempting to smuggle drugs into the facility and that Plaintiff was not expecting a visit from her. (Opp. ¶ 6). However, Plaintiff's expectations and intentions at the time are more properly the subject of his own testimony, and Plaintiff confirms that he had the opportunity to tell his side of the story at the hearing. (56.1 Stmt. ¶ 22; Plf. Tr. at 20:19-22; 54:21-23). While Angelique Marcus may have

16

testified about who she was intending to visit, she confirms in her own statement attached to the opposition that she was visiting Plaintiff. (Opp. at 88). Therefore, there is no basis on which to find that Angelique Marcus's testimony would have changed the outcome of the hearing.

Accordingly, Gutwein's motion is granted as to Plaintiff's Fourteenth Amendment Due Process claim.

## **CONCLUSION**

For the foregoing reasons, Gutwein's motion for summary judgment is GRANTED.[7]

The Clerk of the Court is respectfully directed to terminate the motion sequence pending at Doc. 61, close this case, and mail a copy of this Opinion and Order to Plaintiff.

**SO ORDERED:**

Dated:   White Plains, New York
           December 11, 2023

_____
PHILIP M. HALPERN
United States District Judge

---

[7] Given the conclusions reached herein, the Court need not consider whether Gutwein is entitled to qualified immunity. (Def. Br. at 13-14).